1  EVE H. KARASIK (SBN 155356)
2  DAVID B. GOLUBCHIK (SBN 185520)
3  LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
   10250 Constellation Boulevard, Suite 1700
4  Los Angeles, California 90067
5  Telephone:  (310) 229-1234
   Facsimile:   (310) 229-1244
6  Email: ehk@lnbyb.com; dbg@lnbyb.com
7  Attorneys for Plaintiff

8            UNITED STATES DISTRICT COURT
9            CENTRAL DISTRICT OF CALIFORNIA

10 PRESIDENTIAL HEALTHCARE CREDIT    ) Case No. 2:18-cv-9302
11 CORPORATION, a Georgia corporation, )
                                      )
12              Plaintiff,            )
                                      )
13      v.                            ) **COMPLAINT FOR:**
                                      )   1. **Breach of Written**
14 WHITE RABBIT PARTNERS, INC., a Delaware )         **Contract;**
15 corporation, KLEAN W. HOLLYWOOD LLC, a )  2. **Money Lent;**
   California limited liability company, KLEAN ) 3. **Account Stated;**
16 LONG BEACH, WA, LLC, a Washington limited ) 4. **Breach of Guaranty;**
17 liability company, KLEAN ASTORIA-OR, LLC, ) 5. **Money Due;**
   an Oregon limited liability company, LA PINE ) 6. **Recovery of Personal**
18 KTC, LLC, an Oregon limited liability company, )    **Property;**
   PORTLAND IOP, LLC, an Oregon limited    )  7. **Appointment of Receiver;**
19 liability company, KLEAN PHYSICIANS       )        **and**
   GROUP, LLC, a Washington limited liability ) 8. **Injunctive Relief**
20 company, KPG OREGON, LLC, an Oregon )
   limited liability company, KPG ASTORIA LLC, )
21 an Oregon limited liability company, KPG    )
22 CALIFORNIA, LLC, a California limited liability )
   company, WHITE RABBIT PARTNERS, LLC )
23 (NV), a Nevada limited liability company, WHITE )
   RABBIT PARTNERS, LLC (CA), a California )
24 limited liability company, WELL IN MIND, a )
   California nonprofit corporation, ANDREW )
25 SPANSWICK, an individual, ALAN JASON )
   COE, an individual, and MARK HONZEL, an )
26 individual,                            )
                                          )
27              Defendants.               )
28 _____)

1

Plaintiff, Presidential Healthcare Credit Corporation, a Georgia corporation ("Plaintiff"), complains and alleges as follows:

## JURISDICTION AND VENUE

1. Jurisdiction is based on 28 U.S.C. §§ 1332 and 1348 in that this is a civil action between citizens of different states and in which the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

2. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in this judicial district. The subject contracts and guaranties were prepared and executed in Los Angeles, California, where Defendants maintain their chief offices and where performance of the contracts and guaranties was carried out.

## THE PARTIES

3. Plaintiff is a Georgia corporation with its principal place of business and main office located in Alpharetta, Georgia. Plaintiff is qualified to do business in California.

4. Plaintiff is informed and believes, and based thereon alleges, that, at all times mentioned herein, Defendant WHITE RABBIT PARTNERS, INC. ("White Rabbit"), was and is a Delaware corporation, with its principal place of business located in City of West Hollywood, County of Los Angeles, California.

5. Plaintiff is informed and believes, and based thereon alleges, that, at all times mentioned herein, Defendant KLEAN W. HOLLYWOOD LLC ("Klean Hollywood"), was and is a California limited liability company, with its principal place of business located in City of West Hollywood, County of Los Angeles, California.

6. Plaintiff is informed and believes, and based thereon alleges, that, at all times mentioned herein, Defendant KLEAN LONG BEACH, WA, LLC ("Klean Long Beach"), was and is a Washington limited liability company, with its principal place of business located in Long Beach, Washington.

7. Plaintiff is informed and believes, and based thereon alleges, that, at all times mentioned herein, Defendant KLEAN ASTORIA-OR, LLC ("Klean Astoria"), was and is an Oregon limited liability company, with its principal place of business located in Astoria, Oregon.

8. Plaintiff is informed and believes, and based thereon alleges, that, at all times mentioned herein, Defendant LA PINE KTC, LLC ("La Pine"), was and is an Oregon limited liability company, with its principal place of business located in La Pine, Oregon .

9. Plaintiff is informed and believes, and based thereon alleges, that, at all times mentioned herein, Defendant PORTLAND IOP, LLC ("Portland IOP"), was and is an Oregon limited liability company, with its principal place of business located in Portland, Oregon.

10. Plaintiff is informed and believes, and based thereon alleges, that, at all times mentioned herein, Defendant KLEAN PHYSICIANS GROUP, LLC ("KPG"), was and is a Washington limited liability company, with its principal place of business located in Long Beach, Washington.

11. Plaintiff is informed and believes, and based thereon alleges, that, at all times mentioned herein, Defendant KPG OREGON, LLC ("KPG Oregon"), was and is an Oregon limited liability company, with its principal place of business located in Astoria, Oregon.

12. Plaintiff is informed and believes, and based thereon alleges, that, at all times mentioned herein, Defendant KPG ASTORIA LLC ("KPG Astoria"), was and is an Oregon limited liability company, with its principal place of business located in Astoria, Oregon.

13. Plaintiff is informed and believes, and based thereon alleges, that, at all times mentioned herein, Defendant KPG CALIFORNIA, LLC ("KPG California" and collectively with White Rabbit, Klean Hollywood, Klean Long Beach, Klean Astoria, La Pine, Portland IOP, KPG, KPG Oregon and KPG

Astoria, the "Providers" and individually, "Provider"), was and is a California limited liability company, with its principal place of business located in West Hollywood, California.

14. Plaintiff is informed and believes, and based thereon alleges, that, at all times mentioned herein, Defendant WHITE RABBIT PARTNERS, LLC (NV) ("White Rabbit NV"), was and is a Nevada limited liability company, with its principal place of business located in West Hollywood, California.

15. Plaintiff is informed and believes, and based thereon alleges, that, at all times mentioned herein, Defendant WHITE RABBIT PARTNERS, LLC (CA) ("White Rabbit CA"), was and is a California limited liability company, with its principal place of business located in West Hollywood, California.

16. Plaintiff is informed and believes, and based thereon alleges, that, at all times mentioned herein, Defendant WELL IN MIND ("Well In Mind") was and is a California nonprofit corporation, with its principal place of business located in West Hollywood, California.

17. Plaintiff is informed and believes, and based thereon alleges, that, at all times mentioned herein, Defendant ANDREW SPANSWICK ("Spanswick") is an individual with his residence located in West Hollywood, California.

18. Plaintiff is informed and believes, and based thereon alleges, that, at all times mentioned herein, Defendant ALAN JASON COE ("Coe") is an individual with his residence located in Valley Village, California.

19. Plaintiff is informed and believes, and based thereon alleges, that, at all times mentioned herein, Defendant MARK HONZEL ("Honzel" and collectively with White Rabbit NV, White Rabbit CA, Well In Mind, Spanswick, and Coe, the "Guarantors", and individually, "Guarantor") is an individual with his residence located in Los Angeles, California.

20. Plaintiff is informed and believes, and based thereon alleges, that, at all times mentioned herein, White Rabbit was the 100% equity holder, member or

otherwise owner of the Providers.

## GENERAL ALLEGATIONS

21. Defendant Providers (collectively, the "Borrowers") provide residential and out-patient treatment for substance abuse conditions. In addition, Borrowers offer to select patients leaving their residential treatment services a place to live away from their prior home living conditions. Borrowers also operate three (3) residential buildings with rooms rented out at below market rates to patients.

22. Borrowers' residential treatments facilities are located in West Hollywood, California, with a capacity of 26 patients and in Long Beach, Washington, with a capacity of 50 patients. A facility in La Pine, Oregon is presently closed. Borrowers' Outpatient facilities are located in West Hollywood, California, and Astoria and Bend, Oregon. Both Astoria and West Hollywood can see up to 22 patients a day and Bend has a capacity of nine (9) per day. Borrowers' corporate office is in West Hollywood in the same building as the outpatient office.

23. Borrowers accept insurance on both an in-network and out-of-network basis, although prior to 2018, all insurance was on an out-of-network claim basis. Borrowers do not accept Medicare or Medicaid insurance. Some patients are admitted on a charity basis and are not charged for Borrowers' services,

24. Borrowers' largest operating expenses are for payroll, rent, and marketing. On a monthly basis, Borrowers' total average overhead costs are approximately $1,050,000. The primary expense categories in approximate amounts that comprise these overhead costs are: (a) Payroll: $575,000; (b) Rent: $131,000; (c) Marketing: $103,000; (d) Facility Expense (food, etc.): $36,000; (e) Utilities: $26,000; and (f) Information Technology Services: $20,000.

25. On or about June 30, 2013, Plaintiff, as lender, and Defendant

Providers (collectively, the "Borrowers"), as borrowers, entered into a written Revolving Credit and Security Agreement, as amended, restated, supplemented or otherwise modified from time to time (collectively, the "Credit Agreement"). A true and correct copy of the Credit Agreement is attached hereto as **Exhibit 1**, and incorporated herein by reference.

26. On or about June 30, 2013, for the value received, the Borrowers made, executed and delivered to Plaintiff (a) a Revolving Variable Rate Note in the original sum of $2,900,000 ("Revolving Note"); and (b) a Term Variable Rate Note in the original sum of $1,100,000 ("Term Note" and collectively with Revolving Note, the "Notes"). True and correct copies of the Notes are attached hereto collectively as **Exhibit 2**, and incorporated herein by reference.

27. Through numerous amendments and restatements to the revolving variable rate note, the sum of the borrowing availability under the Revolving Note has been amended and, as of the date of this Complaint, the principal due under the Revolving Note is $7,135,890.79.

28. Pursuant to the Credit Agreement, Providers granted to Plaintiff a security interest in all of their assets to secure repayment of the Notes.

29. The security interest identified in the Credit Agreement is duly perfected UCC-1 Financing Statements on or about July 5, 2013, encumbering all or substantially all assets of the Providers and Well In Mind (collectively, the "Corporate Collateral"). True and complete copies of the UCC-1 Financing Statements are collectively attached hereto as **Exhibit 3** and incorporated herein by reference.

30. On or about June 30, 2013, each of the Guarantors executed a personal guaranty, pursuant to which the Guarantors unconditionally guaranteed any and all obligations due and owing under the Credit Agreement. True and complete copies of the Guaranties are collectively attached hereto as **Exhibit 4** and incorporated herein by reference.

31. On or about July 30, 2015, each of the Guarantors executed amended and restated continuing guaranties, true and correct copies of which are attached hereto as **Exhibit 5** and incorporated herein by reference.

32. Pursuant to the continuing guaranties, in addition to all other duties and obligations under the respective documents, Well In Mind granted to Plaintiff a security interest in substantially all of its assets to secure payment of its obligations under its continuing guaranty (the "WIM Collateral" and collectively with the Corporate Collateral, the "Collateral") by the filing of a UCC-1 Financing Statement.

33. Pursuant to the continuing guaranties, in addition to all other duties and obligations under the respective documents, Guarantors Coe, Honzel and Spanswick entered into Cash Collateral Security Agreements with Plaintiff and, among other things, granted to Plaintiff a security interest in deposit accounts established by each of the foregoing (the "Individual Collateral").

34. Events of Default under (and as defined in) the Credit Agreement occurred and were continuing, in consequence of which Plaintiff was entitled to terminate further advances to or for the benefit of Providers, to declare the entire balance owing to it from Providers to be immediately due and payable, to enforce its security interests and other liens in the collateral securing the indebtedness, liabilities and obligations owing under the Credit Agreement, to enforce its claim against each Guarantor, to enforce its security interests and other liens in any collateral pledged by any Guarantor, and to take all other actions and exercise all other rights and remedies provided in the Credit Agreement or related documents or authorized by applicable law.

35. Defendants requested that Plaintiff forbear from exercising certain remedies available to Plaintiff under the Credit Agreement and applicable law as a consequence of such Events of Default. Defendants further requested that Plaintiff continue, during the period of the forbearance, to make loans to Providers pursuant

to the Credit Agreement.

36. Plaintiff agreed to forbear from exercising certain remedies available to it as a result of such Events of Default and to continue making loans, in its discretion, in accordance with the Credit Agreement, subject to the terms and conditions of that certain Forbearance Agreement dated May 4, 2018 (as at any time amended, restated, supplemented or otherwise modified, the "<u>Forbearance Agreement</u>"), among Plaintiff, Providers and Guarantors. A true and correct copy of the Forbearance Agreement is attached as **Exhibit 6** and incorporated herein by reference.

37. As set forth in the Forbearance Agreement, the Stipulated Defaults (as defined in the Forbearance Agreement) occurred and are continuing under the Credit Agreement.

38. At the request of Defendants, Plaintiff agreed to amend the Forbearance Agreement on three occasions to, among other things, extend the Forbearance Period under (and as defined in) in the Forbearance Agreement to afford Providers additional time to reorganize their affairs and to pay the indebtedness owing to Plaintiff in accordance with the terms of the Credit Agreement.

39. Pursuant to that certain Third Amendment to Forbearance Agreement dated August 21, 2018, among Lender, Providers and Guarantors, the Forbearance Period was extended to September 28, 2018.

40. Additional Events of Default occurred and are continuing under the Credit Agreement, and Defendants failed to satisfy certain of the Forbearance Conditions (as defined in the Forbearance Agreement).

41. By letter dated September 13, 2018 (the "<u>September 13 Notice</u>"), Plaintiff gave notice to Defendants of the Designated Defaults (as defined in the September 13 Notice), which included continuing Events of Default and violations of Forbearance Conditions. A true and correct copy of the September 13 Notice is

attached hereto as **Exhibit 7** and incorporated herein by reference.

42. On September 17, 2018, Providers requested that Plaintiff make an advance to Providers pursuant to the Credit Agreement in the amount of $250,000. In requesting such borrowing, Providers acknowledged and agreed that, if Plaintiff made such advance as requested, the Overadvance (as defined in the Forbearance Agreement) in existence at the end of business on September 17, 2018, would exceed the $1.2 million maximum amount of Overadvance permitted under the Forbearance Agreement by $250,000.

43. To induce Plaintiff to make this advance, Honzel executed that certain letter agreement dated September 17, 2018 (the "Honzel Amendment"), amending that certain Security Agreement (Investment Property) dated as of June 30, 2013 (as at any time amended, restated, supplemented or otherwise modified, the "Security Agreement"), between Honzel and Plaintiff, increasing the value by $249,627 (from $665,373 to $915,000) of the collateral he pledged to secure the Obligations under (and as defined in) the Credit Agreement, thereby constituting cash collateral of Plaintiff.  A true and correct copy of the Honzel Amendment is attached hereto as **Exhibit 8** and incorporated herein by reference.

44. On September 18, 2018, without any obligation to do so, without waiving any of the Designated Defaults (or any other Event of Default existing at that time), in reliance upon the Honzel Amendment, and pursuant to the advance request letter dated September 18, 2018, Plaintiff made an advance of $250,000 to Providers.

45. On September 26, 2018, Providers requested that Plaintiff make another advance to Providers pursuant to the Credit Agreement in the amount of $250,000 to enable Providers to pay payroll due to their employees. In requesting such borrowing, Providers again acknowledged and agreed that, if Plaintiff made such advance as requested, the Overadvance in existence at the end of business on September 26, 2018, would exceed the $1.2 million maximum amount of

Overadvance permitted under the Forbearance Agreement.

46. On September 26, 2018, without any obligation to do so, and without waiving any of the Designated Defaults (or any other Event of Default or violation of Forbearance Conditions existing at that time), and pursuant to the advance request letter dated September 26, 2018, Plaintiff made another advance of $250,000 to Providers to enable them to pay payroll for their employees.

47. On September 28, 2018, Providers requested that Plaintiff make another advance to Providers pursuant to the Credit Agreement for expenditures necessary to preserve and protect the value of the assets securing Providers' indebtedness to Plaintiff under the Credit Agreement. In requesting such borrowing, Providers acknowledged and agreed that, if Plaintiff made such advance as requested, the Overadvance in existence at the end of business on September 28, 2018, would exceed the $1.2 million maximum amount of Overadvance permitted under the Forbearance Agreement and that the balance of advances outstanding exceeded the Maximum Aggregate Revolving Loan Amount (as defined in the Credit Agreement).

48. On September 28, 2018, without any obligation to do so, and without waiving any of the Designated Defaults (or any other Event of Default or violation of Forbearance Conditions existing at that time), and pursuant to the advance request letter dated September 28, 2018, Plaintiff made another advance to Providers of $99,000 to preserve and protect its collateral.

49. The most recent modification to the Forbearance Agreement, dated August 21, 2018, *provides,* among other things, that the forbearance period would terminate on September 28, 2018.

50. Certain Events of Default under the Credit Agreement, Notes and Forbearance Agreement have occurred and are continuing, including, without limitation the following (the "Additional Defaults"):

a. Providers and Guarantors failed to pay the obligations due and

owing under the Credit Agreement in full when the Credit Agreement matured on April 30, 2018;

   b. Defendants' failure to satisfy <u>Section 4(i)</u> of the Forbearance Agreement requiring Providers to deliver, on the last business day of the week of July 30, 2018 and the last business day of each week thereafter until the week of August 27, 2018, to Plaintiff a 4-week rolling Cash Flow forecast, including a projection of Providers' forecasted Availability Amount and liquidity, which forecast is to be in form and is to contain details that are reasonably satisfactory to Plaintiff;

   c. Defendants' failure to satisfy <u>Section 4(x)</u> of the Forbearance Agreement due to Providers' failure, on or before September 4, 2018, to deliver to Plaintiff all financial statements required to be delivered under the Credit Agreement (including any and all adjustments to most recent year-end financial statements and year-to-date financial statements through July 31, 2018), and supporting documentation for accounts receivable and account payable statement balances; and

   d. Defendants' failure to satisfy <u>Section 4(y)</u> of the Forbearance Agreement due to Providers' failure, on or before September 4, 2018, to deliver a business plan to Lapis Advisers, LP for review.

  51. Additionally, on or about August 31, 2018, Providers informed Plaintiff that an Event of Default under the Credit Agreement had occurred and was continuing under <u>Section 3(c)</u> of the Credit Agreement as a result of Providers' failure to remit to Plaintiff approximately $200,000 of Healthcare Receivables in the month of August 2018.

  52. On October 26, 2018, Plaintiff delivered a letter to Borrowers demanding payment of the obligations (the "<u>Payment Demand</u>"). Borrowers have not satisfied their obligations under the Loan Documents. A true and correct copy of the Payment Demand is attached hereto as **Exhibit 9** and incorporated herein by

reference

53. Plaintiff performed all of the promises, conditions and covenants it agreed to perform pursuant to the terms of the Credit Agreement, the Notes, the Forbearance Agreement, together with all other related loan documents (collectively, the "Borrowers' Agreements"), except for those promises, conditions and covenants excused by the acts and omissions of Defendants, and each of them.

54. Plaintiff performed all of the promises, conditions and covenants agreed to perform pursuant to the terms of the Guaranties and related documents (collectively, the "Guarantors' Agreements"), except for those promises, conditions and covenants excused by the acts and omissions of Defendants, and each of them.

55. As of the opening of business on October 26, 2018, the aggregate principal balance outstanding under the Revolver Note, exclusive of accrued interest, fees, charges, costs, attorneys' fees and other amounts chargeable to Providers under such Note, totaled $7,135,890.79, which principal balance includes an Overadvance in the principal amount of $995,177.85.

56. As of the opening of business on October 26, 2018, the aggregate principal balance outstanding under the Term Note, exclusive of accrued interest, fees, charges, costs, attorneys' fees and other amounts chargeable to Providers under such Note, totaled $834,166.57

## FIRST CLAIM FOR RELIEF

### Breach of Written Contract

### Against Defendant Providers

57. Plaintiff incorporates by reference all allegations contained in Paragraphs 1 through 56, inclusive, of the Complaint as if those allegations were set forth herein.

58. Events of Default under the Credit Agreement have occurred, including but not limited to, (a) the Designated Defaults, (b) the Additional Defaults,(c) a material adverse change in the Borrowers' financial condition; (d)

Plaintiff's belief that the prospect of payment or performance of the subject obligation is impaired; and (e) Plaintiff's belief that it is insecure. Pursuant to the terms of said Agreements and as a result of the Events of Default, Plaintiff terminated said Agreements and made demand upon the Borrowers for payment in full of all amounts owing to Plaintiff, but the Borrowers failed and refused and continue to fail and refuse to pay the sums due.

59. The Borrowers' Agreements provide that the Borrowers agree to pay reasonable attorneys' fees incurred by Plaintiff in enforcing its rights under the terms of said Agreements.

## SECOND CLAIM FOR RELIEF
### Money Lent
### Against Defendant Providers

60. Plaintiff incorporates by reference all allegations contained in all paragraphs of this Complaint as if those allegations were set forth herein.

61. The Borrowers became indebted to Plaintiff in the principal account of $7,970,057.33 for money lent for the benefit of the Borrowers by Plaintiff at the Borrowers' request.

62. No part of said sum has been paid, although payment has been demanded.

## THIRD CLAIM FOR RELIEF
### Account Stated
### Against Defendant Providers

63. Plaintiff incorporates by reference all allegations contained in all paragraphs of this Complaint as if those allegations were set forth herein.

64. An account was stated in writing by and between Plaintiff and the Borrowers wherein it was agreed that the Borrowers were indebted to Plaintiff in the principal account of $7,970,057.33 for money lent.

65. The whole of the above sum has not been paid although demand

therefor has been made. As of October 26, 2018, there was due, owing and unpaid to Plaintiff from the Borrowers, jointly and severally, in the principal account of $7,970,057.33, together with interest, late charges fees and costs.

## FOURTH CLAIM FOR RELIEF

### Breach of Guaranty

### Against Defendant Guarantors

66. Plaintiff incorporates by reference all allegations contained in all paragraphs of this Complaint as if those allegations were set forth herein.

67. Pursuant to the terms of the Guaranties, the Guarantors jointly and severally guaranteed to Plaintiff the full and punctual payment, performance and satisfaction of the indebtedness of the Borrowers to Plaintiff. The extension of credit made to the Borrowers by Plaintiff constitutes credit as defined in the Guaranty and was granted to the Borrowers in reliance, in part, upon the obligations of the Guarantors.

68. Plaintiff accepted the Guaranty and, in reliance thereon, extended credit to the Borrowers.

69. As of October 26, 2018, there was due, owing and unpaid to Plaintiff from the Borrowers, jointly and severally, in the principal account of $7,970,057.33, together with interest, late charges fees and costs.

70. Plaintiff made demand upon the Guarantors for payment of the sums due and owing under the terms of the Guaranty; however, the Guarantors failed and refused, and continue to fail and refuse, to pay the sums due and owing to Plaintiff.

71. The Guaranty provides that the Guarantors shall reimburse Plaintiff for all expenses, collection charges, court costs and attorneys' fees that Plaintiff expends or incurs in connection with the enforcement of the Guaranty.

/ / /

/ / /

## FIFTH CLAIM FOR RELIEF

### Money Due

### Against Defendant Guarantors

72. Plaintiff incorporates by reference all allegations contained in all paragraphs of this Complaint as if those allegations were set forth herein.

73. The Guarantors became indebted to Plaintiff for money due to Plaintiff by the Borrowers and Guarantors.

74. As of October 26, 2018, there was due, owing and unpaid to Plaintiff from the Borrowers, jointly and severally, in the principal account of $7,970,057.33, together with interest, late charges fees and costs.

75. Although payment for the amount owing has been demanded, Guarantors have not paid the same.

## SIXTH CLAIM FOR RELIEF

### Recovery of Personal Property

### Against All Defendants

76. Plaintiff incorporates by reference all allegations contained in all paragraphs of this Complaint as if those allegations were set forth herein.

77. Plaintiff holds duly perfected security interest in the Collateral.

78. The Borrowers' Agreements and Guarantors' Agreements provide, among other things, that upon a breach of the terms thereof, Plaintiff is entitled to take possession, control and dominion of the Collateral.

79. Plaintiff is informed and believes and thereon alleges that the Collateral is now in the possession or control of the Defendants ("Possession Defendants") and that the Possession Defendants exercise dominion over the Collateral.

80. Plaintiff is informed and believes and thereon alleges that the Collateral has not been taken for a tax assessment or fine pursuant to a statute or seized under an execution against the property of Plaintiff, or any of its affiliates.

## SEVENTH CLAIM FOR RELIEF

### Appointment of Receiver

### Against Defendant Providers

81. Plaintiff incorporates by reference all allegations contained in all paragraphs of this Complaint as if those allegations were set forth herein.

82. This action is brought under and jurisdiction lies with this Court pursuant to 28 U.S.C. § 1332(a), and the provisions of Federal Rule of Civil Procedure 66.

83. Plaintiff is entitled to the appointment of a receiver at this time and who will have all the usual and customary powers of a receiver, including, but not by way of limitation, safeguarding the Collateral, locating and assembling the Collateral and taking possession, control and dominion thereof, wherever located, in order to fully safeguard and protect the Collateral, and any returned deposits, refunds, income, revenue and proceeds derived therefrom (collectively, the "Receivership Property") from use and dissipation, and to take all appropriate measures that are necessary to protect the Receivership Property.

84. Plaintiff is informed and believes, and on that basis alleges, that unless a receiver is appointed, the Receivership Property will be greatly dissipated in value, lost, used or otherwise unavailable to Plaintiff, all to the detriment and irreparable loss of Plaintiff.

85. In addition, pursuant to Section 5 of the Forbearance Agreement, each of the Defendants have irrevocably consented to the appointment of a Receiver over the Collateral after the Forbearance Termination Date, which was September 28, 2018.

86. Because the Collateral consists primarily of general intangibles, and accounts, deposits and payments due from third parties, Plaintiff has no speedy or adequate remedy at law and will suffer irreparable damage, injury and harm unless the appropriate equitable relief is granted.

# EIGHTH CLAIM FOR RELIEF

## Temporary Restraining Order, Preliminary and Permanent Injunctions - Against All Defendants

87. Plaintiff repeats and realleges the allegations contained in all paragraphs of this Complaint and by this reference thereto incorporates the same herein as though fully set forth.

88. In aid of the receiver, Plaintiff seeks temporary restraining orders and a preliminary and permanent injunction restraining and enjoining all Defendants, their members, officers, agents, employees and representatives, from, among other things, engaging in, or performing, directly or indirectly, any or all of the following acts:

   a. Committing or permitting any waste of the Receivership Property or any part thereof, or suffering or committing or permitting any act on the Receivership Property or any part thereof in violation of law, or removing, transferring, encumbering or otherwise disposing of any of the Receivership Property or any part thereof;

   b. Directly or indirectly interfering in any manner with the discharge of the Receiver's duties under his/her/its Order or the Receiver's possession of and operation or management of the Receivership Property;

   c. Expending, disbursing, transferring, assigning, selling, conveying, devising, pledging, mortgaging, creating a security interest in, encumbering, concealing or in any manner whatsoever dealing in or disposing of the whole or any part of the Receivership Property without prior specific Court Order;

   d. Withholding any Receivership Property assets, books, records, or funds from the Receiver; and

   e. Doing any act which will, or which will tend to impair, defeat, divert, prevent or prejudice the preservation of the Receivership Property.

# PRAYER

**WHEREFORE**, Plaintiff prays for judgment against all Defendants in this action, as follows:

<u>On the First and Fourth Claims for Relief:</u>

1.  For the principal sum of $7,970,057.33, together with interest and other fees and charges pursuant to the Borrowers' Agreements, and Guarantors' Agreements according to proof at time of trial or entry of judgment;

2.  For reasonable attorneys' fees;

<u>On the Second, Third and Fifth Claims for Relief:</u>

3.  For the principal sum of $7,970,057.33, together with interest according to proof at time of trial or entry of judgment;

<u>On the Sixth Claim for Relief:</u>

4.  For judgment for possession of the Collateral.

5.  For reasonable attorneys' fees;

<u>On the Seventh Claim for Relief:</u>

6.  For an order of the Court appointing a receiver over Defendant Providers, pending trial of this action, having all the usual and customary powers of a receiver ("<u>Receiver</u>") to take possession, control and dominion of the Collateral, the revenue, income and profits derived therefrom (the "<u>Receivership Property</u>"), to protect and preserve the Receivership Property and to sell said Property;

<u>On the Eighth Claim for Relief:</u>

7.  For a temporary restraining order and preliminary and permanent injunctions restraining and enjoining All Defendants, their agents, representatives, managers, members, officers, and all persons acting under, in concert with, or for them, from:

    a.  Committing or permitting any waste of the Receivership Property or any part thereof, or suffering or committing or permitting any act

on the Receivership Property or any part thereof in violation of law, or removing, transferring, encumbering or otherwise disposing of any of the Receivership Property or any part thereof;

  b. Directly or indirectly interfering in any manner with the discharge of the Receiver's duties under his/her Order or the Receiver's possession of and operation or management of the Receivership Property;

  c. Expending, disbursing, transferring, assigning, selling, conveying, devising, pledging, mortgaging, creating a security interest in, encumbering, concealing or in any manner whatsoever dealing in or disposing of the whole or any part of the Receivership Property without prior specific Court Order;

  d. Withholding any Receivership Property assets, books, records, or funds from the Receiver; and

  e. Doing any act which will, or which will tend to impair, defeat, divert, prevent or prejudice the preservation of the Receivership Property.

<u>On All Claims for Relief</u>:

8. For costs of suit herein incurred;

9. For such other and further relief as the court may deem proper.

Date: October 30, 2018  LEVENE, NEALE, BENDER, YOO & BRILL, L.L.P.

          By: */s/ Eve H. Karasik*
            EVE H. KARASIK
            DAVID B. GOLUBCHIK
            Attorneys for Plaintiff